SHEREE D. WRIGHT
Senior Counsel
IBF Law Group, PLLC
3101 N. Central Ave, Suite 1250
Phoenix, Arizona 85012
Telephone: (602) 833-1110
Facsimile: (602) 800-5701
e-Mail: sheree@ibflaw.com
SBN# NM 151522
SNB# AZ 035265

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Andrea Trischan, an individual, | ) Case No. |
| | ) |
| Plaintiff, | ) **COMPLAINT** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| Suns Legacy Partners, LLC, an Arizona | ) |
| limited liability company, | ) |
| | ) |
| Defendant, | ) |
| | ) |

Plaintiff Andrea Trischan (hereinafter "Plaintiff" or "Ms. Trischan"), by and through her undersigned counsel, as and for her Complaint in this action against Defendant Suns Legacy Partners, LLC (hereinafter "Defendant Suns" "Defendant"), hereby alleges:

**NATURE OF THE CLAIMS**

**1.** This action seeks declaratory, injunctive, and equitable relief, as well as monetary

1

damages, to address the Defendant's unlawful employment practices against the Plaintiff. These practices include discrimination and harassment based on race, as well as unlawful retaliation following the Plaintiff's complaints about workplace discrimination in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981") and the Arizona Civil Rights Act (ACRA), A.R.S. §41-1401 to §41-1493.02.

## JURISDICTION AND VENUE

**2.** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under section 1981. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

**3.** Venue is proper in this district pursuant to 29 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

**4.** Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"). Plaintiff's EEOC charge arises out of many of the same facts alleged herein that pertains to her Section 1981 retaliation claim.

**5.** When the EEOC completes its investigation of the charge and issues Plaintiff her notice of right to sue, Plaintiff will seek leave to amend this Complaint to add claims that Defendant

violated Title VII.

**6.** All prerequisites to the filing of this suit have been met.

## PARTIES

**7.** Plaintiff Andrea Trischan is a resident of Maricopa County, Arizona. At all times, Plaintiff is and has been a resident of the State of Arizona and met the definition of an "employee" under all applicable statutes.

**8.** Upon information and belief, Defendant Suns is a professional basketball team in the National Basketball Association ("NBA") in the metropolitan Arizona area.

**9.** At all relevant times, Defendant has qualified as an "employer" under all applicable statutes.

**10.** Defendant, or agents of Defendant, participated in the discriminatory and otherwise unlawful employment decision and actions taken against Plaintiff and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes.

## FACTUAL ALLEGATIONS

**Background of Defendant's Organizational Misconduct**

**11.** Defendant Suns has a documented history of concealing instances of racial discrimination, sexual misconduct, and pervasive workplace hostility. Despite publicly asserting its commitment to diversity, Defendant's practices reveal a pattern of systemic discrimination and disregard for employee well-being.

**12.** On November 4, 2021, ESPN published an investigative article titled "Allegations of Racism and Misogyny within the Phoenix Suns: Inside Robert Sarver's 17-Year Tenure as

3

Owner." The article highlighted allegations from over 70 current and former Suns employees, who described Defendant's work environment as toxic, hostile, and rife with racially and sexually discriminatory practices. One former executive noted, "There's literally nothing you could tell me about [Sarver] from a misogynistic or race standpoint that would surprise me." Sarver not only admitted to using racial slurs but also reportedly expressed overt disapproval of diversity efforts." [1]

**13.** Defendant's response to the article involved a defense asserting the organization's alleged commitment to racial diversity, a claim contested by numerous employees who directly contradicted this narrative. While Defendant Suns attempted to counter this claim by asserting the organization's commitment to racial diversity, many employees disputed this defense.

**14.** The ESPN article further revealed egregious instances of misconduct, with multiple former employees detailing their distressing experiences. One employee expressed such profound emotional distress due to the workplace environment that they contemplated suicide.

**15.** In response to these revelations, the National Basketball Association ("NBA") mandated that Defendant address its diversity and inclusion shortcomings, eventually leading to the creation of a Diversity, Equity, and Inclusion (DEI) leadership position.

**16.** In August 2022, Defendant Suns posted a job listing for a DEI Leader. Plaintiff, a highly

---

[1] Baxter Holmes, *Allegations of racism and misogyny within the Phoenix Suns: Inside Robert Sarver's 17-year tenure as owner* (Sept. 13, 2022), available at https://www.espn.com/nba/story/_/id/32440987/phoenix-suns-robert-sarver-allegations-racism-misogyny.

qualified Program Manager of Diversity, Equity, and Inclusion, was subsequently hired by Defendant to advance diversity initiatives within the organization.

**Plaintiff's Role and Initial Challenges**

**17.**  Upon joining the Suns, Plaintiff quickly observed challenges in executing her role effectively. In November 2022, Kim Corbitt, Senior Vice President of People & Culture, presented Plaintiff with a predetermined list of individuals to serve on the Diversity Council. This list included high-ranking executives, raising concerns for Plaintiff about the council's authenticity and its ability to address meaningful change.

**18.**  Plaintiff was initially taken aback by Corbitt's unilateral decision to establish the Diversity Council without consulting her, a decision that undermined Plaintiff's role and authority as the DEI leader.

**19.**  On December 19, 2022, a follow-up ESPN article, titled "When Are Others Going to Be Held Accountable?': Allegations of Suns Misconduct Extend Beyond Robert Sarver," brought additional scrutiny to Defendant. The article cited findings from an NBA investigation revealing that certain Suns executives had engaged in behavior that humiliated and intimidated colleagues. Employees remarked that while Sarver had created the toxic culture, it was the executives who perpetuated it.

**20.**  Following the publication of the article, several of Plaintiff's colleagues expressed concerns about the inclusion of specific executives on the Diversity Council. They questioned the suitability of Jason Rowley (President and CEO), Dan Costello (Executive Vice President and Chief Revenue Officer), Melissa Goldenberg (Senior Vice President and

General Counsel), and Kyle Pottinger (Senior Vice President of Ticket Sales and Services), citing their reputations for discriminatory or hostile behavior.

**Evidence of Racial and Sexual Misconduct by Key Executives**

**21.** Colleagues conveyed specific concerns to Plaintiff regarding certain executives' behaviors. For example, Dan Costello was reported to hinder the promotion of Black employees, favoring those who aligned with his views. Costello allegedly informed a Black colleague that he found it challenging to promote him due to his influence within the organization, a sentiment he did not extend to non-Black employees.

**22.** Costello's actions were not isolated. Another Black employee reported that Costello refused to consider him for a promotion unless he adhered to Corbitt's directives, reflecting a discriminatory standard applied uniquely to Black employees. Additionally, Costello and other executives were observed to maintain an exclusionary, hostile attitude toward Black staff members.

**23.** Another executive, Melissa Goldenberg, has been characterized by employees as overtly racist. She was known to raise her voice to humiliate Black colleagues publicly, contributing to a work environment in which Black employees felt systematically marginalized.

**24.** In addition, Kyle Pottinger developed a reputation as a "predator" within Defendant's organization, exploiting his executive position to solicit sexual favors from female colleagues. When these women rebuffed his advances, Pottinger retaliated by withdrawing his support and advocacy for their careers, further compounding the hostile work environment.

**25.**  Plaintiff also received reports of potential financial misconduct by executives, exacerbating her concerns about the lack of integrity and ethical standards within the organization.

**26.**  Despite raising these issues, Plaintiff encountered resistance from Corbitt, who indicated that the executives in question were included on the Diversity Council to "reshape their image," signaling a superficial approach to diversity that tolerated discriminatory behavior.

**Retaliation Against Plaintiff and Escalation of Hostility**

**27.**  Plaintiff's concerns and investigations into these troubling practices were met with increasing hostility from management. Corbitt discouraged Plaintiff from pursuing her inquiries, and Plaintiff noticed a pattern of retaliation as she continued to address employees' complaints about discriminatory conduct.

**28.**  In March 2023, Plaintiff organized a Women's Lunch and Learn event, managing all aspects single-handedly. Despite receiving positive feedback, Corbitt's demeanor changed abruptly the next day, accusing Plaintiff of "acting aggressively" without substantiating these claims.

**29.**  Tensions continued to rise. In a May 2023 meeting led by CEO Josh Bartelstein, Plaintiff noticed a distinct lack of unity within the HR team. When she suggested a meeting to foster team cohesion, Jessica McNeese erupted, accusing Plaintiff of being "aggressive" and further escalating the situation.

**30.**  Corbitt responded to this incident by placing Plaintiff on administrative leave and later

enforcing a Performance Improvement Plan (PIP) as a pretext for termination, despite previously acknowledging that the incident had been "blown out of proportion, and it's clear what was brought to me is not what transpired."

**31.** Ultimately, Corbitt terminated Plaintiff's employment, citing vague accusations about her performance and alleging a failure to "create an inclusive culture"—ironically, the very issue Plaintiff had sought to address within the Suns organization.

**Plaintiff's Subsequent Legal Actions and Continued Discrimination**

**32.** Following her termination, Plaintiff filed discrimination complaints with the U.S. Equal Employment Opportunity Commission (EEOC) and the Arizona Attorney General's office in July and August 2023.

**33.** Defendant's failure to address these complaints internally became apparent in November 2023 when a new incident surfaced involving another executive, Elizabeth Mariscal. Mariscal made a racially insensitive remark to a Black colleague, "***You only got this position because you're black,***" which ultimately prompted Defendant to finally terminate her employment, emphasizing the persistent, unresolved issues within the organization.

**The Chick-fil-A Comment and Retaliatory Response Against Plaintiff**

**34.** During Plaintiff's tenure with the Suns, she witnessed a concerning incident involving Elizabeth Mariscal, a ***Human Resource Business Partner*** for the organization. On one occasion, Mariscal made a racially insensitive remark directed toward a group of Black employees, including Monet Newton, who were eating Chick-fil-A. Mariscal commented,

8

"***They told us no, the only reason that you guys got Chick-fil-A was because you guys are Black and it's fried chicken***" This remark carried clear racial stereotypes and offended the employees involved, underscoring a pattern of disrespect toward Black staff within the organization.

**35.** The Attorney General's office recently disclosed the recordings of interviews conducted with two key witnesses, who provided significant insights into the organization's internal dynamics and alleged racial biases, specifically implicating Kim Corbitt in issues of discrimination and favoritism.[2]

**36.** On or about October 2, 2024, Monet Newton, who served as a Human Resources Coordinator for the organization, participated in an interview with the Attorney General's Office alongside another witness as part of the investigation into the Plaintiff's allegations. Tragically, on October 15, 2024, just weeks later, Ms. Newton was murdered, cutting short her life and contributions to this case.[3]

**37.** In her interview, Newton detailed a similar experience, ***highlighting Corbitt's role in fostering a culture of discrimination and favoritism toward non-Black employees***. She described instances of team members "lying a lot" and stated that Mariscal, a colleague, exhibited racist behavior that Corbitt overlooked. ***Monet expressed that her own opportunities for promotion were limited due to her race, and she observed that Corbitt***

---

[2] *Carter v. Chrysler Corp.*, 173 F.3d 693, 700–01 (8th Cir. 1999) (holding that intraracial discrimination, including instances of alleged discrimination by Black coworkers against another Black employee, is actionable under Title VII and 42 U.S.C. § 1981, as the focus is on racial animus rather than the racial identity of the parties involved; further noting that evidence of racial slurs, hostility, and retaliation may establish a hostile work environment and support claims of racial discrimination).

[3] *Samira Asma-Sadeque***,** *Parents of Ariz. Woman Fly in for Her Graduation, Find Her Dead in Apparent Murder-Suicide,* People (Oct. 17, 2024), https://people.com/monet-newton-murder-suicide-arizona-8729660.

9

*did not support Plaintiff, who was attempting to implement new initiatives*. According to Newton, Mariscal continually disrespected Plaintiff, eventually driving her to a breaking point. Newton also recounted that when Corbitt learned about a supportive interaction between Plaintiff and Jessica McNeese, Corbitt reprimanded only Plaintiff, despite Plaintiff's positive reputation among colleagues as a "safe space" for discussing workplace issues.

**38.** Newton expressed a deep mistrust toward Human Resources, feeling that Corbitt and Goldenberg, the Chief Legal Officer, ignored reports of discrimination, thereby discouraging employees from coming forward. She recalled a specific incident involving a racist remark related to Chick-fil-A. She recounted that during a company event, a colleague remarked, " *They told us no, the only reason that you guys got Chick-fil-A was because you guys are Black and it's fried chicken*," a comment that was offensive and racially charged. When this incident was reported to Human Resources, the response was dismissive, advising to "brush it off," which further marginalized the concerns, feeling unsupported, especially with Robert Smith, another senior leader, present. Newton voiced frustration at her lack of promotional opportunities, despite her significant contributions and being the youngest on her team. Her account further emphasizing perceptions of favoritism, racial bias, and an unsupportive workplace environment within the organization, largely attributed to Corbitt's and other leaders' actions.

**39.** Understanding the significance of this racially charged comment, Plaintiff promptly

reported the incident to Corbitt, her direct supervisor. Plaintiff emphasized the impact of such comments on the organization's atmosphere and its effect on Black employees who already felt marginalized. Plaintiff's report was made in good faith, aligned with her role as the Program Manager of Diversity, Equity, and Inclusion, and was part of her efforts to foster a respectful and inclusive workplace.

**40.** Corbitt dismissed Plaintiff's concerns with a trivializing response, stating, "Elizabeth was just kidding; lighten up." This response effectively ignored the racial overtones of Mariscal's comment and minimized the issue, signaling to Plaintiff that her concerns about discrimination were not being taken seriously. By downplaying the incident, Corbitt demonstrated an unwillingness to address inappropriate conduct by executives and implicitly discouraged Plaintiff from raising similar issues in the future.

**41.** The second witness described the organization's pervasive racial bias, primarily linked to Kim Corbitt's management practices. He explained that when race-related misconduct or workplace grievances were reported to Corbitt, she often dismissed these issues with remarks like, "***I don't think that's what this person meant***" or "***I didn't see it like that.***" He attributed these responses to Corbitt's close relationships with certain employees, perceiving her actions as efforts to shield them from accountability. ***The witness underscored that Black employees faced a "different burden of proof" and stated that Corbitt's management created a notably harsher work environment for them, as she reportedly imposed stricter scrutiny on Black employees to avoid perceptions of favoritism. This additional pressure, he felt, was not applied to non-Black employees.*** He also shared

a conversation with Joy Harper, questioning why Pottinger remained employed despite numerous complaints. Harper reportedly explained that Pottinger received private coaching, which the witness perceived as preferential treatment and leniency toward certain individuals.

**42.** Moreover, another incident within the organization highlights the nature of its culture when a situation arose that required Plaintiff's investigation. Cierra Carter, a Black woman who interned with the Suns during the summer of 2022 as part of the NBA HBCU fellowship,[4] was well-regarded by colleagues, who consistently described her as pleasant and easy to work with. However, her supervisor, Mariscal, provided a final evaluation that starkly contrasted with this feedback, describing Carter as "hard to work with" and a "terrible intern." This negative assessment prompted Carter's professor to seek clarification from another Suns team member, who confirmed that Carter had been an excellent intern. When Plaintiff reported this discrepancy to Senior Vice President Kim Corbitt, Corbitt dismissed the concern, stating, "Elizabeth does not represent the organization; she is just one person." This incident highlights issues of racial bias and the organization's inadequate response to such concerns.

**43.** Similarly, following Plaintiff's report, Plaintiff began to experience increasingly

---

[4] The NBA HBCU (Historically Black Colleges and Universities) Fellowship Program is designed to offer career development opportunities for both undergraduate and graduate students from HBCUs. Participants in the program come from diverse backgrounds, with a significant representation from the African American community. The initiative aims to foster professional growth and create pathways for success in the sports industry for students from historically underrepresented groups.

hostile treatment from Corbitt and other members of management. Corbitt's dismissive attitude toward Plaintiff's concerns about race-based discrimination contributed to an environment where Plaintiff's role as DEI leader was undermined, and her credibility was questioned.

**44.** Shortly after Plaintiff's report of the Chick-fil-A incident, Corbitt began to accuse Plaintiff of "acting aggressively" without basis or specific examples. This unfounded accusation seemed intended to undermine Plaintiff's professional reputation and discourage her from taking further action regarding racial sensitivity within the organization. Notably, these accusations arose only after Plaintiff began addressing issues of race and discrimination, reinforcing the retaliatory nature of the accusations.

**45.** Corbitt later placed Plaintiff on a Performance Improvement Plan (PIP), citing alleged issues with Plaintiff's interpersonal conduct. Generally, Defendant issues two written warnings before placing an employee on a PIP. However, Plaintiff never received any formal write-ups. As such, Defendant's claims that Plaintiff's work performance was subpar lack a factual basis. This further underscores the differential treatment Plaintiff faced due to her race, as the witness stated during his interview with the Attorney General's Office, that Corbitt treats Black employees more harshly. The PIP, however, was baseless and served as a pretext for eventual termination. Prior to reporting incidents like the Chick-fil-A comment, Plaintiff had consistently received positive feedback regarding her performance and dedication. The PIP was thus clearly a retaliatory measure aimed at penalizing Plaintiff for challenging the organization's tolerance of discriminatory behavior.

**46.** Ultimately, Corbitt terminated Plaintiff's employment, asserting vague reasons related to Plaintiff's performance and ability to "work well with others." However, this justification lacked credibility, as Plaintiff's performance had been praised prior to her reporting of the discriminatory comment. The termination was the culmination of a series of retaliatory actions triggered by Plaintiff's efforts to hold the organization accountable for racially insensitive and discriminatory conduct.

**47.** The retaliatory measures taken against Plaintiff had a chilling effect on her ability to perform her role as Program Manager of Diversity, Equity, and Inclusion. Corbitt's dismissal of the Chick-fil-A incident and subsequent punitive actions discouraged Plaintiff from pursuing additional complaints or investigations into discriminatory behavior within the organization, ultimately obstructing her role and damaging her professional standing.

**48.** Following her termination, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission (EEOC) and the Arizona Attorney General's office. Her complaint highlighted the organization's dismissive and retaliatory stance on race-related issues and documented the direct link between her termination and her efforts to report and address racial discrimination, including the Chick-fil-A incident.

**Retaliatory Actions Taken Against Plaintiff**

**49.** Plaintiff's attempts to investigate and address instances of discrimination within the organization were met with resistance. Corbitt directly discouraged Plaintiff from investigating employee complaints linked to a published ESPN article detailing misconduct

14

within the Suns organization. Corbitt cautioned Plaintiff against pursuing these complaints, suggesting that Plaintiff's inquiries into racism and workplace misconduct were unwelcome.

**50.** After Plaintiff successfully organized a Women's Lunch and Learn event in March 2023, Corbitt praised her efforts. However, the following day, Corbitt accused Plaintiff of "acting aggressively" without any evidence or specific examples. This sudden and unfounded accusation was an attempt to undermine Plaintiff's credibility and retaliate against her for her ongoing work in addressing issues of racial discrimination.

**51.** In May 2023, Plaintiff proposed a unity meeting to foster cohesion among HR team members. Jessica McNeese responded by accusing Plaintiff of "being aggressive," creating a scene in which she claimed to feel "attacked" and escalated tensions within the team. Although McNeese later apologized privately to Plaintiff, Corbitt used the incident as a basis for placing Plaintiff on administrative leave. This action was punitive and unsupported by evidence, as surveillance footage would have confirmed Plaintiff's calm demeanor, yet Corbitt ignored Plaintiff's request to review it.

**52.** Plaintiff's administrative leave, Corbitt implemented a Performance Improvement Plan (PIP) for Plaintiff, despite Plaintiff's record of positive feedback prior to her advocacy on discrimination issues. This PIP was a transparent attempt to build a case for Plaintiff's termination. Corbitt's rationale—citing Plaintiff's alleged inability to "work well with others" and "create an inclusive culture"—was a pretext, as Plaintiff's efforts had consistently been aimed at fostering inclusivity and addressing discriminatory practices within the organization.

**NBA Mandate and Defendant's Failure to Comply**

**53.** Following the investigation into Robert Sarver's conduct as owner of the Phoenix

Suns and Mercury, the National Basketball Association ("NBA") implemented a series of

comprehensive measures designed to address and prevent workplace misconduct and

discrimination.[5] These measures were announced in response to findings of pervasive issues

of racial discrimination, sexual misconduct, and a hostile work environment within the Suns

organization during Sarver's tenure.

**54.** Based on information and belief, Defendant Phoenix Suns failed to fully implement

and follow through on the NBA's mandated workplace improvements until Plaintiff's filing

of her charge of discrimination brought additional scrutiny to the organization.

**55.** The NBA's mandate emphasized the importance of promoting diversity and

inclusion through concrete initiatives. However, Defendant did not actively or meaningfully

address these goals until Plaintiff, a highly qualified Program Manager of Diversity, Equity,

and Inclusion, was hired in August 2022. Even after Plaintiff's hiring, Defendant's diversity

efforts remained superficial, as evidenced by the appointment of individuals with troubling

histories of discrimination to the Diversity Council.

**56.** While mandatory training on respect and appropriate conduct was a core

component of the NBA's mandate, employees within the organization continued to

demonstrate racially insensitive and inappropriate behavior, as detailed in this complaint.

Incidents such as Elizabeth Mariscol's Chick-fil-A comment and her racially biased

---

[5] **Wachtell, Lipton, Rosen & Katz, Report of Independent Investigators to the National Basketball Association (Sept. 13, 2022),** https://www.nba.com/news/nba-investigation-robert-sarver-suns-official-release.

evaluation of Cierra Carter exemplify a lack of effective training and accountability within the organization.

**57.** Defendant failed to establish and enforce robust mechanisms for confidential reporting and investigation of workplace misconduct, as required by the NBA's mandate.

**58.** Plaintiff's role was pivotal in advancing the goals outlined by the NBA's mandate. However, her efforts were met with resistance from senior executives, including Kim Corbitt, who dismissed Plaintiff's concerns, undermined her authority, and retaliated against her for addressing systemic issues of discrimination and hostility. This resistance highlights Defendant's failure to embrace the NBA's directives genuinely.

**59.** Despite Plaintiff's dedication to fostering a more inclusive and equitable workplace, she faced escalating retaliation for her efforts. Her termination was not only unwarranted but also emblematic of Defendant's broader failure to comply with the NBA's mandate to create a safe and inclusive work environment.

**60.** Defendant did not conduct the periodic assessments required by the NBA to evaluate the effectiveness of workplace reforms. This lack of oversight allowed discriminatory practices and misconduct to persist unchecked within the organization.

**61.** The NBA's mandate sought to address the deep-rooted issues of discrimination and workplace hostility that plagued the Suns organization. However, Defendant's failure to implement these measures meaningfully—and its retaliatory actions against Plaintiff for attempting to address these shortcomings—demonstrates a blatant disregard for the NBA's

directives. This noncompliance not only perpetuated a hostile work environment but also directly contributed to the harm suffered by Plaintiff.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

**62.** Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**63.** Defendant violated Section 1981 by subjecting Plaintiff to retaliation for her protected complaints and opposition to Mariscal's discriminatory comments on the basis of race and ethnicity, by, inter alia, terminating Plaintiff's employment with the Company.

**64.** As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

**65.** As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**66.** Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive

damages.

## SECOND CAUSE OF ACTION
### (Violation of Arizona Law Against Discrimination)

**67.** Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**68.** Defendant discriminated against Plaintiff in violation of the Arizona Law Against Discrimination by subjecting her to disparate treatment because of her race, by, *inter alia*, terminating Plaintiff's employment with the Company.

**69.** As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Arizona Law Against Discrimination, Plaintiff has suffered and continues to suffer financial and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**70.** Defendant's unlawful discriminatory conduct constitutes a willful and wanton violation of Arizona Law Against Discrimination, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the Arizona Law Against Discrimination)

**71.** Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**72.** Defendant has violated the Arizona Law Against Discrimination by

subjecting Plaintiff to retaliation for her protected complaints and opposition to Defendant's discriminatory comments and practices on the basis of race and ethnicity by, *inter alia*, terminating Plaintiff's employment with the Company.

**73.** As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the Arizona Law Against Discrimination, Plaintiff has suffered and continues to suffer monetary and/or economic damages as well as suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**74.** Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the Arizona Law Against Discrimination, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

**A.** A declaratory judgment that the actions, conduct and practices of Defendant's complained of herein violate the laws of the United States and the State of Arizona;

**B.** An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

**C.** An order directing Defendant to place Plaintiff in the position she would have

occupied but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

**D.** An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

**E.** An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries.

**F.** An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

**G.** An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

**H.** An award of punitive damages;

**I.** An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's

reasonable attorneys' fees to the fullest extent permitted by law; and

**J.**  Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues.

**EXECUTED** this 13th day of November 2024.

**IBF LAW GROUP, PLLC**

By:  /s/ Sheree D. Wright
Sheree D. Wright
Attorney for Plaintiff